UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
*ex rel.* BEVERLY ENGLUND,

NO. CIV. S-04-282 LKK/JFM

        Plaintiffs,

    v.

O R D E R

LOS ANGELES COUNTY, et al.,

        Defendants.

_____/

    Relator, Beverly Englund, brings a qui tam suit against defendant, Los Angeles County, under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, <u>et</u> <u>seq.</u>, alleging that the county made false claims and/or conspired with others in order to receive unwarranted funds under the Federal Medicaid Program ("Medicaid").[1]  The United

////

////

_____

    [1] In addition to her FCA claim, relator alleges a slew of related causes of action.

1

States has elected not to intervene in this suit.[2]  Pending before the court is defendant's motion to dismiss for lack of subject matter jurisdiction.

## I.

### BACKGROUND

The Medicaid statute creates a partnership between federal and state governments to fund health care services for the indigent. 42 U.S.C. § 1396; 42 C.F.R. Parts 430, 440, 441, 447.[3] To receive funds under Medicaid, a state must submit a state plan that meets various federal requirements.  Among these requirements is that the state contribute specified amounts to Medicaid.  42 U.S.C. § 1396a.  In California, the state's financial participation is approximately fifty percent.[4]

Medicaid typically requires eligible health care providers, including counties, to be paid on a fee-for-service basis.  42 U.S.C. § 1396(a)(30)(A).  The U.S. Secretary of Health and Human Services may waive this requirement, however, if upon application the State can demonstrate that, inter alia, the waiver would promote cost-effectiveness and efficiency.  42 U.S.C. § 1315(a).

---

[2]  After filing a complaint under the FCA, a relator must disclose her evidence of fraud to the Government.  The Government then has sixty days to intervene in the suit. 31 U.S.C. § 3730(b).

[3]  The Medicaid program in California is Medi-Cal, which is codified at California Welfare & Institutions Code Sections 14000-14198.

[4]  The federal government's share, or "Federal Financial Participation" ("FFP"), must be no less than 50%, and no more than 83% percent.  See 42 U.S.C. § 1396d(b).

2

1    In 1982, pursuant to a federal waiver applied for and

2  received, the California Legislature established the Selective

3  Provider Contracting Program ("SPCP") to ensure access to hospital

4  inpatient care for Medicaid beneficiaries in California and to make

5  the Medicaid program more efficient and cost-effective.  Cal. Welf.

6  & Inst. Code, Article 2.6 ("Selective Provider Contracts"), §§

7  14081-14087.29.   The SPCP was intended to achieve savings by

8  replacing the regulatory model with a competitive model.[5]

9    The SPCP authorizes a State agency, the California Medical

10 Assistance Commission ("CMAC" or "the Commission"), to negotiate

11 the reimbursement rates and supplemental payments with hospitals

12 that provide Medicaid inpatient services.  CMAC meets twice a month

13 in open and closed sessions to consider new contracts and

14 amendments to existing contracts.

15 **A.   CALIFORNIA SAFETY NET HOSPITALS (OR DISPROPORTIONATE SHARE
       HOSPITALS ("DSH"))**

16

17   California's health care system provides health-related

18 services to persons who lack health insurance or other coverage,

19 such as Medi-Cal, and cannot pay for care.  In many cases, these

20 "safety net providers" belong to counties, which ultimately are

21 responsible for serving those with no other means of public or

22 ////

23 ───────────────

24    [5]  Under the SPCP, California contracts with hospitals that
    provide services to Medicaid beneficiaries at negotiated per diem
    rates, plus supplemental payments as needed, in lieu of Medicaid's
25  traditional fee-for-service reimbursement.  Under the SPCP, almost
    all Medicaid inpatients must go to a SPCP contracting hospital.
26  Cal. Welf. & Inst. Code §§ 14081 & 14087.

1  private support.[6]  Cal. Welf. & Inst. Code § 17000.  One of

2  California's programs to assist DSH Hospitals, is the SB 1255

3  program.[7]

4  **B.   THE SB 1255 PROGRAM**

5       In 1989 the California Legislature adopted Senate Bill 1255

6  ("SB 1255"), which created the SB 1255 Program (codified at Cal.

7  Welf. & Inst. Code § 14085.6).[8]  SB 1255 provides supplemental

8  payments to certain eligible DSH hospitals.  Contracts with DSH

9  providers are negotiated by CMAC.[9]  The statute expressly provides

10 that the funding mechanism for the non-federal portion of the SB

11 1255 program will come solely from intergovernmental transfers

12

13 _____

14      [6]  "DSH" institutions are hospitals that treat
   disproportionate share of indigent and low income individuals. DSH
15 hospitals receive supplemental federal and state funds to help
   subsidize the costs associated with providing care to indigent and
16 very low income uninsured individuals who are not eligible for
   Medicaid coverage.

17      [7]  The program is administered by the state Department of
   Health Services ("DHS").
18

19      [8]  Cal. Welf. and Inst. Code § 14085.6 designates SB 1255
   Program as the "Emergency Services and Supplemental Payments" Fund
20 ("ESSP").  ESSP is also referred to as Fund 693.

21      [9]  While SB 1255 is not a DSH program, it benefits largely the
   same facilities and its funding is nearly identical.  To be
22 eligible to negotiate with CMAC for SB 1255 funds, a hospital must:
   1. be a contract hospital under the SPCP; 2. be a DSH Medi-Cal
23 provider; 3. demonstrate a purpose for additional funding,
   including proposals for expanding or improving access to emergency
24 room and other health services; and 4. be licensed to provide basic
   or comprehensive emergency services (or be a Children's hospital
25 which provides emergency services in conjunction with another
   hospital); or 5. be a hospital designated by the National Cancer
26 Institute as a comprehensive or clinical cancer research center.
   Cal. Welf. & Inst. Code § 14085.6.

1   ("IGTs")[10] voluntarily provided by the participating hospitals

2   (Cal. Welf. & Inst. Code § 14085.6(c)), which are matched by the

3   State with federal funds, and then remitted back to the providers

4   as supplemental payments.[11]  CMAC sets the amount to be received by

5   each participating hospital, and also recommends the size of the

6   IGT to be sent to the State by that government provider.[12]

7   ////

8   ////

9   ////

10   ////

11   ////

12

13      [10] Intergovernmental transfers are transfers of public funds between governmental entities.  The transfer may take place from

14   one government agency or level (usually a county, city, or hospital district) to the state, or within the same level of government.

15   The Medicaid statute, as well as federal regulations, expressly permit use of such public funds as the non-federal share of Medicaid spending.  <u>See</u> Section 1903(w)(6)(A) of the Social

16   Security Act (42 U.S.C. § 1396b(w)(6)(A)); section 1902(a)(2) of 42 U.S.C. § 1396a(a)(2)(2000); 42 C.F.R. § 433.51(b)(setting

17   conditions for use of local government funds).  The states' use of IGTs has been part of the Medicaid program since 1965.  In

18   essence, the state serves as the intermediary between that the county and the federal government for the receipt of federal funds.

19

20      [11] The matching federal funds are paid into the State operated Health Care Deposit Fund ("Fund 912"), a fund established

21   by the State from which expenditures are made of state, county and federal funds for health care and administration under this chapter

22   and Chapter 8 (commencing with Section 14200).  Cal. Welf. & Inst. Code § 14157.  Money from Fund 912 is distributed by the State to

23   eligible claiming providers, such as defendant.  The State's financial participation is taken from Fund 693 and also deposited

24   into Fund 912.  The CMAC then distributes payments to public and private hospitals through negotiations.

25      [12] There is no set formula as to the amount a given hospital can receive, and by statute, the negotiations are confidential.

26   <u>See</u> Cal. Gov't Code § 6254(g).

# II.

## FACTS[13]

From April 2, 2001 to July 30, 2002, relator, Beverly Englund, was employed by the California Department of Health Services ("DHS") as a staff services manager with the Medi-Cal Operations Division ("MCOD").

Englund alleges that defendant, Los Angeles County, made false claims and statements in order to secure additional funding under California Welfare & Institutions Code Section 14085.6, approximately half of which were federal funds.  She asserts that defendant did not use the additional funding for a purpose under the State's Selective Provider Contracting Program, but instead expended most of the funding for non-healthcare purposes.  She alleges that the defendant "caused the State to make false records and statements to get false or fraudulent claims by the State for federal matching funds paid or approved by the Government."  The fraudulent claims "caused the Government to pay the State hundreds of millions of dollars in Medicaid funds that were then paid to defendant and which would not have been paid, but for the misconduct of Defendant."

The County is a health care provider that operates under the SPCP waiver and submits claims to the State pursuant to agreements with CMAC pursuant to the SB 1255 Program.  Englund alleges that the defendant knew that claims it submitted under the SB 1255

_____

[13]  The facts section is derived from relator's second amended complaint.

6

program as negotiated with CMAC would trigger a chain of events leading the State to make claims on the Government that would result in defendant receiving and/or retaining funds from Fund 912, "approximately half of which are federal Medicaid funds and approximately half are funds from Fund 693."[14]

Relator alleges that each year since 1994, the State was required to submit certification documents to the federal government and that each such certification was false and known by defendant to be false in a number of respects. Specifically, she asserts that:

> a.  The expenditures by the State to Defendant under the SB 1255 Program were not used to provide health care and related remedial or preventive services to qualifying individuals, including related social services which are necessary for those individuals;
>
> b.  The payments from Fund 693 were not made for the purposes of California Welfare & Institutions Code Section 14085.6;
>
> c.  In negotiating contracts with CMAC, defendant did not demonstrate a proper purpose for the funds claimed under the SB 1255 Program;
>
> d.  The negotiator for CMAC did not consider the criteria set forth in California Welfare & Institutions Code Section 14083 in agreeing to the amounts to be paid Defendant;
>
> e.  Most of the federal funds reimbursed to the State and then paid to defendant under SB 1255 were not used for Medicaid inpatient hospital services.

---

[14]  As noted above, the matching federal funds are paid into Fund 912, a fund "established by the State from which expenditures are made of state, county and federal funds for health care and administration.  Money from Fund 912 is distributed by the State to eligible claiming providers, such as defendant.  The State's financial participation is taken from Fund 693 and also deposited into Fund 912.

1       According to relator, defendant knowingly used the above-
2   described "scheme" to get the government to contribute Medicaid
3   dollars to defendant, which defendant then expended for
4   non-Medicaid, and even non-healthcare, purposes.  Englund asserts
5   that from fiscal year 1997-1998 forward, the contract with CMAC
6   required that "[t]o the extent the County DHS has surplus funds
7   remaining at the close of the 2001/2002 fiscal year, all such
8   surplus shall be treated by the County of Los Angeles as a reserve
9   for the use of the County DHS in subsequent years."  She alleges
10  that in every year from 1994 through 2002 there was such a surplus
11  but that defendant has never treated such surpluses as a reserve
12  for County DHS.  Rather, such surpluses were used for general
13  government purposes having little or nothing to do with Medicaid
14  or health care.

15      Thus, it is alleged, that in each year since 1994, defendant
16  knew that it had received SB 1255 payments to which it was not
17  entitled.  Yet, defendant did not notify the State of these
18  overpayments so that the State could accurately prepare Form CMS
19  64.[15]  Rather, defendant "knowingly caused" the State to make false
20  reports and certifications to the government on the quarterly Form
21  CMS 64 that the expenditures to defendant under the SB 1255 Program
22  were "allowable and in accordance with applicable implementing

---

[15]   The State submits a Quarterly Medicaid Statement of
Expenditures for the Medical Assistance Program (Form CMS 64) to
the government.  The form identifies the payments that have been
made from Fund 912 and is used to reconcile the amounts paid from
Fund 912 with the federal funds transferred by the government for
those payments.

1  federal, state and local statutes, regulations, policies and the
2  state plan."  Defendant remained silent while the State made false
3  claims to the government and defendant retained the excess payments
4  to which it was not entitled.

5  **A.   RELATOR'S DISCOVERY OF FRAUD**

6       Beginning around May 2001, one of relator's duties at MCOD was
7  to oversee the preparation of invoices regarding claims made by
8  defendant under the SB 1255 Program, based on defendant's contract
9  and contract amendments.  Englund alleges that defendant knew its
10 contract and contract amendments would serve as the basis for the
11 State's claim upon the government for FFP.   In or about December
12 2001, relator began to suspect that defendant, in order to obtain
13 federal funds to which it was not entitled, had falsely represented
14 its need for additional funding of approximately $716 million under
15 the SB 1255 Program.

16      Relator's suspicions were initially based upon her belief that
17 defendant's proper Medi-Cal expenditures could not be as high as
18 reported, and was derived from information she obtained about Los
19 Angeles County's Medicaid financing practices.  Her suspicions
20 increased through the following spring based upon her observation
21 of closed-session negotiations between CMAC and defendant in which
22 defendant demanded additional SB 1255 funding without demonstrating
23 a purpose for it, comments made in CMAC and MCOD meetings, and her
24 analysis of State and County documents, including review of
25 portions of secretly-negotiated contracts between CMAC and
26 defendant.

1    Englund was concerned about signing invoices certifying that
2  the amounts claimed on the invoice had been expended by defendant
3  "in compliance with all terms/conditions, laws and regulations
4  governing its payment." She consequently inquired of others in DHS
5  as to what responsibility she had to ensure that defendant was
6  using the full amount of its SB 1255 Program payments on legitimate
7  Medicaid expenditures. She received no answer. Relator then
8  investigated further, reviewing as many claim schedules, invoices,
9  secretly-negotiated contracts and financial statements as she could
10 access. Based on this investigation, she came to the conclusion
11 that defendant was participating in a "scheme" to obtain
12 unwarranted funds that had been in operation for many years.
13    Relator alleges that by virtue of the scheme the government
14 has paid, and defendant (through the State) has received, hundreds
15 of millions of dollars in federal "matching" funds to which it was
16 not entitled. Relator stated that she informed her associates that
17 she felt uneasy with the situation, and left her job at MCOD as
18 soon as she was able to find another position.
19    At the time she left MCOD in July 2002, relator believed that
20 the SB 1255 Program would be included in a federal audit then in
21 process, and that she expected that defendant's scheme would be
22 uncovered. Relator has since learned, however, that the audit did
23 not address the allowance of the payments under the SB 1255 Program
24 or uncover the scheme, and believes that defendant has continued
25 to use the scheme to obtain inflated amounts of FFP.
26 ////

1                          **III.**

2                       **STANDARDS**

3          Defendant moves pursuant to Fed. R. Civ. P. 12(b)(1),

4    contending that relators cannot surmount the public disclosure

5    limitation in the False Claims Act.  Repl. at 14-15.[16]

6          The party seeking to invoke the jurisdiction of the federal

7    court has the burden of establishing that jurisdiction exists.

8    KVOS, Inc. v. Assoc. Press, 299 U.S. 269, 278 (1936); Scott v.

9    Breeland, 792 F.2d 925, 927 (9th Cir. 1986).  On a motion to

10   dismiss pursuant to Fed. R. Civ. P. 12(b)(1), the standards that

11   must be applied vary according to the nature of the jurisdictional

12   challenge.

13         If the challenge to jurisdiction is a facial attack, i.e., the

14   defendant contends that the allegations of jurisdiction contained

15   in the complaint are insufficient on their face to demonstrate the

16   existence of jurisdiction, the relator is entitled to safeguards

17   similar to those applicable when a Rule 12(b)(6) motion is made.

18   See United States of America, ex rel. Marilou McKenzie and Ila Swan

19   v. Crestwood Hospitals, Inc., Civ. s-97-107 LKK/GGH (E.D. Cal.

20   1997).  The factual allegations of the complaint are presumed to

21   be true, and the motion is granted only if the relator fails to

22   allege an element necessary for subject matter jurisdiction.  Id.

23

24         [16]  They  state that "for purposes of this motion . . . the
     County is content to have the court assume that the basic
25   propositions  advanced  by  the  relator  (those  as  to  which  she
     actually  has  presented  some  evidence,  however  speculative  or
26   inadmissible) are correct.  Repl. at 14.

1 (citations omitted).  A complaint will be dismissed for lack of

2 subject matter jurisdiction (1) if the case does not "arise under"

3 any federal law or the United States Constitution, (2) if there is

4 no case or controversy within the meaning of that constitutional

5 term,  or  (3)  if  the  cause  is  not  one  described  by  any

6 jurisdictional statute.  Baker v. Carr, 369 U.S. 186, 198 (1962).[17]

7 **IV.**

8 **ANALYSIS**

9 Defendant moves to dismiss this action pursuant to the public

10 disclosure jurisdictional bar under the False Claims Act.  See 31

11 ////

12 ////

13 ////

14 _____

15 [17]  If the challenge to jurisdiction is made as a "speaking

16 motion" attacking the truth of the jurisdictional facts alleged by
the plaintiff, a different set of standards must be applied.
Thornhill Pub. Co., Inc. v. Gen. Tel. & Elec. Corp., 594 F.2d 730,

17 733 (9th Cir. 1979).  Where the jurisdictional issue is separable
from the merits of the case, the district is free to hear evidence
regarding jurisdiction and to rule on that issue prior to trial,

18 resolving factual disputes where necessary.  Augustine v. United
States, 704 F.2d 1074, 1077 (9th Cir. 1983); Thornhill, 594 F.2d

19 at 733.  "In such circumstances "[n]o presumptive truthfulness
attaches to plaintiff's allegations, and the existence of disputed

20 material facts will not preclude the trial court from evaluating
for itself the merits of jurisdictional claims."  Augustine, 704

21 F.2d at 1077 (quotation omitted).  On a motion going to the merits,
the court must employ the standard applicable to a motion for

22 summary judgment.  Farr v. United States, 990 F.2d 451, 454 n.1
(9th Cir. 1993), cert. denied, 510 U.S. 1023 (1993).  Relator

23 asserts that because the County has submitted multiple documents
that "intertwine its jurisdictional argument with the merits of the

24 case," the court cannot resolve the jurisdictional question without
reaching the merits of the case itself.  Opp'n at 6.  Because

25 defendant has made it clear that its motion is a facial challenge,
relator's argument that the court must reach the merits of this

26 matter is not well-taken.

1  U.S.C. § 3730(e)(4)(A).[18]   I decide this matter based on the

2  pleadings, the papers filed herein, and after oral argument.  As

3  I explain below, defendant's motion must be denied.

4  **A.   QUI TAM SUIT**

5      The False Claims Act ("FCA") imposes civil monetary penalties

6  for the submission of false claims to the government.  To state a

7  claim under the FCA, relators must allege that defendant submitted

8  a claim for payment from the government, that the claim was false

9  or fraudulent, and that the defendant knew the claim was false or

10  fraudulent.  See 31 U.S.C. § 3729(a).[19]  The injury suffered by the

11  United States under the FCA is "the difference between what the

12  government actually paid and the amount it would have paid in the

14      [18]  The statute provides:

15      No court shall have jurisdiction over an action under
        this section based upon the public disclosure of
16      allegations or transactions in a criminal, civil, or
        administrative hearing, in a congressional,
17      administrative, or Government Accounting Office report,
        hearing, audit, or investigation, or from the news
18      media, unless the action is brought by the Attorney
        General or the person bringing the action is an original
19      source of the information.

20  31 U.S.C.A. § 3730.

21      [19]  The FCA imposes liability on a person who:

22      (1) knowingly presents, or causes to be presented, to an
        officer or employee of the Government or a member of an
23      armed force a false or fraudulent claim for payment or
        approval; [or]
24      (2) knowingly makes, uses, or causes to be made or used,
        a false record or statement to get a false or fraudulent
25      claim paid or approved.

26  31 U.S.C. § 3729(a).

13

1  absence of the fraudulent claim." <u>Horizon West Inc. v. St. Paul</u>
2  <u>Fire And Marine Ins. Co.</u>, 214 F.Supp.2d 1074, 1077 (E.D. Cal.
3  2002)(Levi, J.)(quoting <u>United States ex rel. Woodard v. Country</u>
4  <u>View Care Center, Inc.</u>, 797 F.2d 888, 893 (10th Cir. 1986)).

5      Liability under the FCA is based solely upon the creation or
6  presentation of false claims to the government, not upon the
7  underlying conduct used to establish the falsity of such a claim.
8  <u>See</u> 31 U.S.C. § 3729(a); <u>United States ex rel. Hopper v. Anton</u>, 91
9  F.3d 1261, 1266 (9th Cir. 1996).

10 **B.  FCA'S JURISDICTIONAL BAR**

11     As noted, the FCA bars a qui tam action that is based on
12 allegations or transactions already disclosed in certain public
13 fora, unless the relator is the original source of the information
14 underlying the action.   <u>See A-1 Ambulance Serv., Inc. v.</u>
15 <u>California</u>, 202 F.3d 1238, 1243 (9th Cir. 2000).  In analyzing
16 whether a claim is barred under the FCA, the court must first
17 determine whether there has been a prior "public disclosure" of the
18 "allegations or transactions" underlying the qui tam suit.  <u>See Id</u>.
19 (citation omitted).  "If and only if there has been such a public
20 disclosure," the court then must inquire into whether the relator
21 is an "original source" within the meaning of § 3730(e)(4)(B).  <u>Id</u>.
22     The question of whether the "allegations or transactions"
23 underlying the relators' fraud claims have been publicly disclosed
24 "requires two separate but related determinations."  <u>See A-1</u>
25 <u>Ambulance Serv.</u>, 202 F.3d at 1243.  First, the court "must decide
26 whether the public disclosure originated in one of the sources

1  enumerated in the statute." <u>Id</u>.  Public disclosure can occur in

2  one of only three categories of public fora: (1) in a "criminal,

3  civil, or administrative hearing;" (2) in a "congressional,

4  administrative, or Government Accounting Office report, hearing,

5  audit, or investigation;" or (3) in the "news media." <u>Id</u>. (quoting

6  31 U.S.C. § 3730(e)(4)(A)).

7       If there has been a public disclosure through one of these

8  sources, the court then determines whether the content of the

9  disclosure consisted of the "allegations or transactions" giving

10 rise to the relators' claim, as opposed to "mere information."

11 <u>Hagood v. Sonoma County Water Agency</u>, 81 F.3d 1465, 1473 (9th Cir.

12 1996).  The substance of the disclosure, however, need not contain

13 an explicit "allegation" of fraud, so long as the material elements

14 of the allegedly fraudulent "transaction" have been disclosed.  <u>See</u>

15 <u>id</u>. (citing <u>United States ex rel. Springfield Terminal Ry. v.</u>

16 <u>Quinn</u>, 14 F.3d 645, 654 (D.C. Cir. 1994)).

17 **C.  RELATOR'S ALLEGATIONS**

18      In resolving motions such as that at bar, the court is

19 ultimately tasked with comparing the purportedly disclosed

20 information to the allegations of relator's complaint.  Before

21 turning to the required analysis, the court must revisit relator's

22 allegations.  Defendant contends that relator presents "a rapidly

23 moving target as to what, exactly, is the nature of the purported

24 fraudulent claim by the County."  In part, because of the

25 complexity of the Medicare system, relator's pleadings leave much

26 to be desired in terms of clarity.  Nonetheless, the court believes

15

1  it can identify relator's essential claim.

2      As noted above, to state a cognizable claim under the FCA,

3  relator must allege that defendant submitted a claim for payment

4  from the government, that the claim was false or fraudulent, and

5  that the defendant knew the claim was false or fraudulent.  See 31

6  U.S.C. § 3729(a).  As defendant notes, because the state has no

7  liability under the FCA, relator could only sue the County, which

8  is a health care provider of the Medi-Cal program.[20]  Mot. at 1.

9      Because the gravamen of her claim involves a complex funding

10 scheme of supplemental Medi-Cal payments in which the State is the

11 conduit or intermediary through which the county obtains funds from

12 the United States,[21] relator is forced to make a convoluted

13 argument based on her allegations that the County "caused the state

14 to make false records and statements . . . for federal matching

15 funds paid or approved by the Government." Second Amended Compl.

16 ("SAC") at 3.

17      In her complaint, relator alleges that defendant has made a

18 false claim by virtue of the fact that "[d]efendant knows that the

19 claims it submits under the SB 1255 Program as negotiated with CMAC

20 will trigger a chain of events leading the State to make claims on

21 ─────────────

22     [20]  See Vermont Agency of Natural Resources v. United States
   ex rel. Stevens, 529 U.S. 755 (2000).  During oral argument, the
23 County conceded that even though the State could not be sued,
   plaintiff could properly bring a claim against the County.

24     [21]  As explained previously, under the SB 1255 program the
   County transfers funds to the state through IGTs.  The State then
25 must certify to the government that the funds will be utilized for
   appropriate purposes, at which point the federal government matches
26 that amount.

the Government that will result in Defendant receiving and/or retaining funds from Fund 912 . . . ." SAC at 7. She explains that the County misrepresented information on the contract and the contract amendment the county submits to the State in order to receive SB 1255 funds. SAC at 10-13. As defendant points out, relator essentially avers that the County has not directly made a false claim to the federal government, but that its actions caused the State to make the false claims on its behalf. Such a contention would require the court to accept the argument that if the State made a false claim to the federal government, then the County made a false claim to the federal government. Because defendant has not moved to dismiss on this basis, but apparently concedes the propriety of such an allegation, the court will assume that such a claim falls within the qui tam statute.

From what the court can determine, the false claim that defendant allegedly made to the State, which was consequently made to the federal government, is that the funds which were disbursed to it by the State under SB 1255 would be used to provide health care and related remedial or preventative services when, in actuality, the funds disbursed to it were "expended for non-Medicaid, and even non-healthcare purposes."[22] Although not entirely clear from their complaint, the court clarified with

---

[22] Relator avers that "[m]ost of the federal funds reimbursed to the State and then paid to Defendant under SB 1255 were not used for Medicaid inpatient hospital services . . . and funds paid to Defendant were improperly "reallocated" to non-healthcare expenditures in violation of Appendix D to the CMAC contracts from fiscal year 1997-1998 forward." SAC at 12.

1  counsel for relator during oral argument, that relator avers that

2  defendant misused both the funds transferred to the State by the

3  County (what defendant refers to as "IGT" funds), and the federal

4  matching funds.[23]

5  **D. DEFENDANT'S TENDERED "PUBLIC DISCLOSURES"**

6      Defendant submits with its motion to dismiss numerous lengthy

7  exhibits with pages numbering in the hundreds, which it asserts

8  contains sources which have previously disclosed plaintiff's

9  alleged fraudulent scheme.[24]  In some cases, defendant fails to

10 provide a specific page number or citation where the "public

11 disclosure" is contained.  In other cases, the exhibit is not

12 ////

13 ////

14 _____

15      [23]  See SAC at 9 ("After receiving payment of its claim from
the State, Defendant uses most of the SB 1255 disbursement for non-
16 healthcare purposes"); SAC at 10 ("The expeditures by the State to
Defendant under the SB 1255 Program were not used to provide health
care and related remedial or preventive services to qualifying
17 individuals . . . ."; SAC at 11 ("The payments from Fund 693 were
not made for the purposes of California Welf. & Inst. Code Section
18 14085.6"); SAC at 12 ("Most of the federal funds reimbursed to the
state . . . were not used for Medicaid inpatient hospital
19 services"); SAC at 12 ("Funds paid to Defendant were improperly
"reallocated" to non-healthcare expenditures in violation of
20 Appendix D to the CMAC contracts . . . ."); SAC at 12 ("Defendant
knowingly used the scheme . . . to get the Government to contribute
21 Medicaid dollars to Defendant, which Defendant then expended for
non-Medicaid, and even non-healthcare, purposes").  This
22 distinction is important to note because, as explained infra,
defendant moves to dismiss this complaint based on documents which,
23 at best, suggest that the IGT funds were not being used for proper
purposes, whereas plaintiff alleges that both federal and county
24 funds were spent on non-healthcare expenditures.

25      [24]  It appears to the court that many of defendant's allegedly
public disclosure sources have little, if anything, to do with SB
26 1255 or the fraudulent scheme alleged by plaintiff.

1  numbered.[25]  The court, therefore, will only discuss the documents

2  which, at the very least, discuss SB 1255.[26]

3  _____

4     [25] As the Seventh Circuit has aptly stated, "[j]udges are not like pigs, hunting for truffles buried in briefs." United States

5  v. Dunkel, 927 F.2d 955, 956 (7th Cir 1991).

6     [26] The court will not discuss the following, but provides descriptions of the following documents for the purpose of demonstrating their apparent  irrelevance  to the fraudulent

7  transaction alleged by relator:
   1. Wecker Decl., ¶ 12 and Ex. 4 - Defendant represents that

8  this document "disclosed and discussed the impact of IGTs and net/gross operating incomes . . . with regard to which the SB 1255

9  distributions are made." This exhibit is a request made by DHS to extend funding for a Section 1115 Medicaid Demonstration Project.

10  The demonstration project made federal funds available to the County in order to stabilize its public health system but appears

11  to have little to do with SB 1255.
   2. Morris Decl., Ex. 1. Defendant submits a GAO report which

12  investigates the Medicaid systems of Michigan, Tennessee, and Texas. The report does not focus on or discuss California's

13  Medicaid system, which is at issue here.
   3. Morris Decl., ¶¶ 8-9, Ex. 4. Defendant submits a

14  scholarly article that deals with DSH loopholes. The article does not even mention SB 1255 and appears not to be relevant because SB

15  1255 is not a DSH program.
   4. Morris Decl., Ex. 5. Defendant submits a report completed

16  by the HCFA inspector general which describes how IGTs work in certain states to enhance federal benefits. The report describes

17  the Medicaid systems in Alabama, Pennsylvania, and Nebraska. California was not studied for the purposes of this report. Nor

18  does the report discuss SB 1255.
   5. Morris Decl., Ex. 10. This exhibit is a review completed

19  by The United States' Health and Human Services which examines how IGT schemes operate in Alabama and Pennsylvania. The report does

20  not address SB 1255. Strangely, defendant concedes in its opposition that the report does not address SB 1255, but still

21  files it with the court.
   6. Morris Decl., Ex. 12. This exhibit is a statement made

22  by an official at HHS. The statement discusses the general problem where States often do not match the federally-provided funds under

23  Medicaid. However, this report does not discuss the transaction relator described in her pleadings.

24     Defendant also submits over 4 more lengthy exhibits for the court's consideration in conjunction with its reply brief.

25  Plaintiff complains that this is improper because defendant makes new arguments in reliance on these exhibits. Plaintiff moves to

26  strike any new arguments and accompanying exhibit. The court

1   **E.   WAS THERE A PUBLIC DISCLOSURE?**

2        The court turns to the three apparently potentially relevant

3   documents which defendant argues previously disclosed relator's

4   false claim allegations.[27]   Defendant's arguments are unavailing.

5        **1.   "Board Letters" (Rhind Decl., Ex. A)**

6        Defendant tenders letters addressed to the Los Angeles County

7   Board of Supervisors from the Director of Health Services

8   encouraging the members to adopt an amendment to the County's Medi-

9   Cal contract to facilitate the transfer of IGTs to the State.

10  Defendant explains that these letters were related to and the

11  subject of Board actions taken at open public meetings, and which

12  were publicly available as of the date they were received by the

13  Board.  Rhind Decl. at 2.  Defendant avers that these letters were

14  available by telephonic or in-person request.  Id.

15  ////

16  ─────────────────

17  agrees with plaintiff and the motion to strike is GRANTED.  No new
    arguments or additional exhibits filed concurrently with

18  defendant's reply brief will be considered by the court. "It is
    improper for a moving party to introduce new facts or different

19  legal arguments in the reply brief than those presented in the
    moving papers." Lujan v. Nat'l Wildlife Federation, 497 U.S. 871,

20  894-95 (1990).  Defendant also spends substantial time in its reply
    brief discussing arguments which go to the merits of relator's FCA

21  claim, which is not at issue for purposes of this motion.

22       [27]  As I explained above, the first determination this court
    must make is whether the alleged public disclosure "originated in

23  one of the sources enumerated in the statute."   United States of
    America ex rel. Foundation Aiding the Elderly v. Horizon West Inc.,

24  265 F.3d 1011 (9th Cir. 2001).  The court must then ask whether
    there has been a public disclosure through one of those sources –

25  i.e., whether the content of the disclosure consisted of the
    "allegations or transactions" giving rise to relator's claim, as

26  opposed to "mere information."   Hagwood v. Sonoma County Water
    Agency, 81 F.3d 1465, 1473 (9th Cir. 1996).

20

1  There is no doubt that publicly-filed documents, readily
2  available to the public, and the subject of administrative
3  proceedings, fall within the ambit of "administrative hearing[s]"
4  under the FCA.  Public board meetings certainly qualify as an
5  administrative hearing.  See A-1 Ambulance Serv. Inc., 202 F.3d at
6  1244 (San Mateo Board of Supervisors proceedings qualifies as a
7  "hearing" within the meaning of the FCA).  Further, documents filed
8  with an agency during administrative proceedings, which these
9  letters were, are also considered publicly disclosed.  See Hagwood,
10 81 F.3d at 1474, n. 13.

11    Nevertheless, the court must reject defendant's assertion that
12 these letters disclosed relator's claim.  The Board letters
13 includes the following language:

14   **Purpose of Recommended Action**:
     Approval of this amendment [to the Los Angeles County
15   Medi-Cal inpatient hospital contract] will enable the
     Department to secure SB 1255 Medi-Cal funding for Fiscal
16   Year 1998-99 to support Department of Health Services
     (DHS) operations.  The California Medical Assistance
17   Commission (CMAC) authorized this amendment at its May
     27, 1999 meeting.
18

19   **Justification**:
     Approval of Amendment No. 25 (attached) will result in
20   CMAC providing a total _gross_ SB 1255 Medi-Cal Contract
     supplemental distribution to the County of $625.0
21   million ($306.2 million _net_), to be made on or about
     June 17, 1999, following an intergovernmental transfer
22   (IGT) of $318.8 million by the County to the State on
     June 3, 1999.
23
     CMAC is anxious to distribute the full $625.0 million by
24   June 30, 1999 so that these monies will be counted under
     CMAC's Medi-Cal contracting waiver budget neutrality cap
25   for Fiscal Year 1998-99 and the County is equally
     anxious to receive the proceeds prior to the end of this
26   fiscal year for cash flow reasons.

1    Fiscal Impact:
     The transaction will provide $306.2 million in
2    previously anticipated net funding to help finance the
     Department's operations as provided for in the
3    Board-adopted budget for Fiscal Year 1998-99. . . .

4    Financing:
     Under the SB 1255 program, the County must provide an
5    IGT to constitute the State's share of the $625.0
     million gross Medi-Cal distribution.  Accordingly, an
6    IGT of $318.8 million will be made to the State on June
     3, 1999.

7

8    Rhind Decl., Ex. A (emphasis original).

9    Defendant argues that these letters are relevant because "it

10   is clear from the context of the document as a whole that "these

11   monies" refers to the net payment (the gross amount less the IGT)."

12   Repl. at 16.  Defendant explains that the sentence, "Approval of

13   Amendment No. 25 (attached) will result in CMAC providing a total

14   gross SB 1255 Medi-Cal Contract supplemental distribution to the

15   County of $625.0 million ($306.2 million net), to be made on or

16   about June 17, 1999, following an intergovernmental transfer (IGT)

17   of $318.8 million by the County to the State on June 3, 1999,"

18   means that the County did not use its full gross SB 1255 payments

19   from the federal government (received as payment for services it

20   had rendered under its Medi-Cal contract with the state) to fund

21   health programs.  The argument is not persuasive.  The language the

22   defendant relies on hardly discloses that the County did not use

23   its entire SB 1255 funds for health-related purposes.  Rather, it

24   appears to do no more than explain the gross amount of money that

25   defendant would receive from the federal government if it were to

26   transfer $318.8 million dollars to the state.

1        The  Ninth  Circuit  emphasizes  that  the  substance  of  the

2   disclosure  need  not  contain  an  explicit  allegation  of  fraud  "so

3   long   as   the   material   elements   of   the   allegedly   fraudulent

4   transaction  are  disclosed  . . . ."  Horizon West, 265 F.3d 1011 (9th

5   Cir. 2001)(citation and quotation omitted).   Here, the substance

6   of  Englund's  allegations  is  that  defendant  did  not  use  SB  1255

7   funds  it  received  (both  the  county  share  and  the  federal  share)  for

8   health-related  purposes.   These  letters  fall  far  short  of

9   containing  the  substance  of  relator's  averments.

10        **2.   County of Los Angeles Comprehensive Annual Financial
           Report (CAFR)(Hammond Decl. at ¶¶ 2-4, Ex. A)**

11

12        Defendant  also  offers  the  County  of  Los  Angeles'  annual  report

13   for  fiscal  year  2001,  a  voluminous  report  numbering  at  least  75

14   pages,  but  defendant  does  not  cite  to  any  page  numbers  for  its

15   contentions.[28]  Defendant  argues  that  the  report  reveals  that  the

16   County  did  not  use  its  full  gross  SB  1255  payments  for  health

17   services,  Repl. at 16,  and  that  "when  the  gross  SB  1255

18   distribution  is  received  from  the  State,  the  amount  of  the  IGT  that

19   was  made  in  order  to  obtain  that  distribution  is  returned  to  the

20   County's  general  fund."  Mot. at 12.   There  are  numerous  charts,

21   figures,  and  graphs  which  the  court  is  unable  to  make  sense  of.

22   The  court  wishes  to  be  clear  that  it  is  defendant's  burden  to  prove

23   its  case  as  the  moving  party.   However,  from  the  court's  own

24   examination,  it  appears  that  there  is  one  paragraph  in  the  report

25   _____

26        [28]  Indeed,  the  report  is  not  even  numbered.   See n.25 supra.

23

1  which discusses SB 1255:

2      SB 1255 which became effective in 1990 established the
       State Disproportionate Share and Emergency Services Fund
3      to receive contributions from public agencies.   The
       State then utilizes these funds to obtain additional
4      Federal matching funds.   The total is then distributed
       to the participants through a negotiation process
5      . . . .  For Fiscal Year 2000-2001, the county
       contributed $372 million, and corresponding revenues
6      were $716 million. The county contribution to the State
       is recorded as a health expenditure of the General Fund.
7      The revenue is recorded in the Hospital Enterprise Funds
       as patient services revenue.   Reimbursement to the
8      General Fund for the contribution is recorded as an
       operating transfer from the Hospitals to the General
9      Fund (emphasis added).

10 Defendant argues that the CAFR discloses that "when the gross SB

11 1255 distribution is received from the State, the amount of the IGT

12 that was made to obtain that distribution is returned to the

13 County's general fund." Mot. at 12.  This apparently refers to the

14 last sentence. That sentence, however, appears to be a memorial

15 concerning the County's accounting practice, rather than a

16 revelation of the fact of complete reimbursement.   Whatever the

17 quoted language means, it certainly does not directly reveal that

18 the funds received by the County were to be used for non-health

19 purposes.   Indeed, the phrase "[t]he county contribution to the

20 State is recorded as a health expenditure of the General Fund"

21 appears to undermine defendant's argument that the CAFR reveals

22 that the funds would not be used for health care purposes.

23 Moreover, the plaintiff alleges that both the IGT funds returned

24 to the defendant and some portion of the federal funds were not

25 used for health care purposes, an allegation clearly not addressed

26 by the CAFR.  I conclude that there was no public disclosure made

24

in the County's CAFR.

**3.   Statements Made to HCFA Staff in a meeting about L.A.'s Healthcare Crisis), Wecker Decl. ¶¶ 5-9, Exs. 1, 2**

Defendant offers the declaration of Allan Wecker, the Chief-Fiscal Programs for the County's Department of Health Services. Wecker explains that in the mid-1990s, the County of Los Angeles was in the midst of a budget deficit, which led county officials to meet with various officials in Washington, D.C.  Wecker Decl. at 2-3.  On January 18-19, Wecker avers that he explained to various federal attendees[29] "the differences between 'gross' and 'net' revenues through disbursements from the State to the County under the Medi-Cal programs known as SB 1255, as well as under other Medicaid programs."  <u>Id</u>. at 4.  He further avers that on January 31, 1996, he met with officials in Washington regarding the budget crisis and "made it very clear that only 'net FFP' (that is, the State of California's gross payments under SB 1255 and SB 855, less the IGT amount originally provided by the County to the State) was considered by the County to be supplemental revenue available to the County for health care funding," <u>id</u>. at 5, i.e., the IGT amount provided by the county would not be used for health care purposes.  Defendant's arguments fail for several reasons.

First, defendant has not demonstrated that the meetings held between county officials and the federal government officials constitute a "public disclosure."  In <u>A-1 Ambulance</u>, the Ninth

---

[29]  Wecker states that the attendees included employees of HHS.

1   Circuit held that a county public agency proceedings was an

2   "administrative hearings." It did so, however, after reviewing the

3   nature of the hearings, public comment, and the distribution of

4   documents.  The court noted that the hearings were "deliberate and

5   not incidental," that it was "made open to public attendance and

6   actually invited, as well as received, public comment."  202 F.3d

7   at 1238.  Nothing in the Wecker declaration suggests that the

8   meetings relied on by the defendant was of such a character.

9   Defendant contends that the meetings constituted a "disclosure"

10  under the FCA because the County made such disclosures "directly"

11  to the federal government.  At best, such a contention goes to the

12  issue of whether there was a fraud, a merits issue, and not to

13  whether there was a public disclosure. In any case, as I explain

14  below, the court need not resolve whether the Washington D.C.

15  meetings constitute an acceptable category of fora under the FCA.

16      Although Wecker claims that he made clear that only the FFP

17  would be available for health care services, and the federal

18  government was then made aware that the IGT funds (the amount the

19  county transferred to the state) were not used for such purposes,

20  this statement does not characterize the entire fraudulent scheme

21  alleged by relator.  While it is true that the allegations need not

22  specifically identify the fraud at issue, Horizon West Inc., 265

23  F.3d at 1016, the "fraudulent scheme" relator allegations involve

24  the defendant misusing both the funds transferred to the state and

25  the federal matching funds.  Here, Wecker only states that the IGT

26  funds were considered not to be revenue available to the County for

                                    26

1   health care funding.  Wecker Decl. at 5.  For all the above

2   reasons, I conclude that the declaration is insufficient.

3   _____For the reasons stated above, defendant's motion to dismiss

4   is DENIED.

5          IT IS SO ORDERED.

6          DATED:  August 30, 2005.
                                    /s/Lawrence K. Karlton
7                                   LAWRENCE K. KARLTON
                                    SENIOR JUDGE
8                                   UNITED STATES DISTRICT COURT

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26