UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
*ex rel.* BEVERLY ENGLUND,

NO. CIV. S-04-282 LKK/JFM

     Plaintiffs,

    v.

O R D E R

LOS ANGELES COUNTY, et al.,

     Defendants.

_____/

    Pending before the court are four motions.  Plaintiff filed two motions for partial summary judgment and defendant filed a motion to dismiss and motion for summary judgment.

    Plaintiff, Beverly Englund, brings a qui tam suit against defendant, Los Angeles County, ("County") under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, et seq., alleging that the County made false claims and/or conspired with the State of California in order to receive unwarranted funds under the Federal Medicaid Program ("Medicaid").  The United States has elected not to intervene in this suit.  The court resolves the matter based on the

1  parties' papers and after oral argument.

2                                    **I.**

3                    **FACTS & PROCEDURAL HISTORY**[1]

4  **A.    Medicaid Overview**

5       Medicaid is a federal program designed to enable states to

6  furnish medical assistance to the indigent.  See 42 U.S.C. § 1396.

7  Under the Medicaid statute, the Federal government contributes to

8  participating states' costs of providing medical assistance to

9  Medicaid-eligible persons.  See id. at § 1396 b(a)(1).  The states

10 administer the program, make payments for medical assistance, and

11 then seek reimbursement from the Federal government.  See 42 C.F.R.

12 § 430.30.

13 **B.    Selective Provider Contracting Program ("SPCP" )**

14      Medicaid typically requires eligible health care providers,

15 including counties, to be paid on a fee-for-service basis.  42

16 U.S.C. § 1396(a)(30)(A).  This requirement may be waived, however,

17 if a state demonstrates that the waiver would promote cost-

18 effectiveness and efficiency.

19      California applied for and received such a waiver in 1982.

20 Pursuant to this waiver, the California Legislature established the

21 Selective Provider Contracting Program ("SPCP"),see Cal. Welf. &

22 Inst. Code §§ 14081 & 14087.  The SPCP was intended to achieve

23 savings by replacing the regulatory model with a competitive model.

24 Under the SPCP, California contracts with hospitals that provide

25 _____

26      [1] Undisputed unless otherwise noted.

                                    2

services to Medicaid beneficiaries at competitively negotiated rates in lieu of Medicaid's traditional fee-for-service reimbursement. Id. The California Medical Assistance Commission ("CMAC") negotiated the rates with the providers, including the County. CMAC meets twice a month in open and closed sessions to consider new contracts and amendments to existing contracts.

The Federal government, specifically, the Centers for Medicare & Medicaid Services ("CMS") renewed the SPCP waiver roughly every two years between 1982 and 2005. The waiver was granted on the condition that (1) the overall program be cost-effective and (2) "[a]ll aggregate payments to hospitals including negotiated per diem rates and sub-program payments must not exceed each individual hospital's aggregate Medicaid customary charges."). See Fiore Letter at 2, Ex. 5 of Christine Yip Decl. ("Yip Decl."). Through a somewhat complicated procedure, the details of which are not relevant to the pending motions, the SPCP saved money. Thomas Scully Dep. at 42:21-43:14., ("Scully Dep.") Ex. 16 of Yip Decl.; Melnick Decl., Ex. 2 at 17. It was understood by local, state and federal officials that the savings gained through the SPCP waiver could be used by the State in any way they saw fit.[2] As discussed

---

[2] Plaintiff disputes that the savings could be used for non-medical care purposes. However, this dispute is not material. As discussed at greater length in the analysis section of this order, there is ample evidence that even if the County and State were improperly using the SPCP savings, the Federal government knew of this practice, thereby negating defendant's intent to defraud or make false claims.

1   more fully in the analysis section of this order, this arrangement

2   was controversial.  That said, the practice of using the savings

3   in any way the State saw fit was well-known.  For example, Thomas

4   A. Scully, the Administrator for CMS testified that "we let the

5   State use their savings and the Federal savings for other [non-

6   medical] purposes."  Scully Dep. at 84:3-86:17, Ex 16. of Yip Decl.

7   As Scully explained, "under the waiver, we essentially let

8   California and other states with similar waivers not just get their

9   savings but the Federal savings as well and redirect it

10  theoretically to health care programs," but because "money was

11  fungible in the State's budget" states could spend the savings on

12  whatever they choose.  Id.

13  **C.    Intergovernmental Transfers (IGTs)**

14      IGTs are transfers of funds from one governmental entity to

15  another, typically between a local government and the State.  IGTs

16  were used as the non-federal share for purposes of accessing

17  federal Medicaid matching funds.  "Such transfers - which typically

18  require that public entities at the city or county level transfer

19  funds to the State - are specifically sanctioned by the Medicare

20  Act, which grants states the flexibility to fund up to 60% of their

21  share of Medicare expenditures with local dollars."  Alaska Dep't

22  of Health and Soc. Services v. Centers for Medicare and Medicaid

23  Services,  424 F.3d 931, 936 (9th Cir. 2005), citing 66 Fed. Reg.

24  3148, 3148 (2001).

25      The use of IGTs to fund the State's share of Medicaid was

26  controversial.  There was wide recognition that IGTs allowed

4

states to maximize their ability to "pull down" federal money.[3]

Scully Dep. at 17:15-18:25, Ex. 16 of Yip Decl.  Indeed, in 1993,

Congress enacted various limits on the use of IGTs.  See, e.g.,

The Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66,

§ 13621(b), 107 Stat. 312, 630 (limiting the amounts of certain

disproportionate share hospital payment adjustments to uncovered

costs).  The limits placed on the use of IGTs are referred to as

Upper Payment Limits ("UPLs").  UPLs set a maximum amount that

a state may pay to Medicaid providers and still receive federal

matching funds.  "In other words, a state could conceivably make

payments to providers in excess of the UPLs but it could not

legitimately receive any federal matching contributions towards

the excess amount."  Ashley County Medical Ctr. v. Thompson, 205

F. Supp. 2d 1026, 1033 (E.D. Ark. 2002).  The typical UPL was

100% of a hospital's uncompensated costs.

It is important to note, however, that Congress granted an

exception with respect to California.  In 1997, Congress granted

California relief from the UPL caps and allowed providers such

as the defendant to use IGTs to receive 175% of their

uncompensated costs. See Balanced Budget Act of 1997, Pub. L.

105-33, Title IV, § 4721(e), 111 Stat. 251, 514.

**D.   SB 1255 Program & Disproportionate Share Hospitals ("DSHs")**

Federal Medicaid law directs states to take into account

---

[3] Again, plaintiff disputes the extent to which IGTs could be
used to draw federal funds.  However, for the reasons set forth in
footnote 2, this dispute is immaterial.

"the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. § 1396a(a)(13)(A)(iv).

Under the authority of the SPCP waiver, the California Legislature enacted Senate Bill 1255 ("SB 1255")(codified at Cal. Welf. & Inst. Code § 14085.6).  SB 1255 provided supplemental payments to certain eligible DSH hospitals for uncompensated costs.  Id.

Hospitals that (1) served a disproportionate share of low income patients, (2) operated an emergency room, and (3) were "able to demonstrate a purpose for additional funding under the [SPCP] including proposals relating to emergency services and other health care services . . . that are made available, or will be made available, to Medi-Cal beneficiaries," were eligible to negotiate with CMAC for supplemental payments under SB 1255. See Cal. Welf. & Inst. Code § 14085.6(g).  The defendant was one of the providers eligible to receive supplemental funds.[4]

Based on the amount of money in the fund and the amount of the anticipated federal reimbursement, CMAC negotiated with eligible public and private providers for the share of the

---

[4] Plaintiff maintains that the County was not eligible for supplemental funding because it could not demonstrate a "purpose" for the supplemental funding. See Pl.'s Opp'n to Def.'s Mot. for Summ. J., at 13.  However, as previously noted, even if plaintiff's contention is taken as true, there is ample evidence that the Federal government knew of the County's practices. Therefore, the fact that the County may have been in violation of the State code is immaterial.  In any event, the Federal government was not responsible for enforcement of the State statute.

1  supplemental funds each would receive.  Bryon Chell Dep. Vol. 1

2  at 25:24-27:21, ("Chell Dep."), Ex. 6 of Yip Decl.

3      It is undisputed the County sought the most money - within

4  the legally applicable limits - it could get for the County's

5  Department of Health Services.  County negotiators disclosed to

6  CMAC that (1) the County sought the largest SB 1255 payment

7  possible without exceeding the cap set by Congress; (2) the

8  County needed additional revenues to push off forecasted

9  department-wide budget deficits in later years; and (3) the

10 County included only the "net" amount of the SB 1255 funding

11 (gross payment minus IGT amount) in calculating the budget of its

12 Department of Health Services, because it returned an amount

13 equivalent to the IGT to the County general fund. See generally

14 Pl.'s SUF 9.[5]

15     After receiving SB 1255 distributions as payment for having

16 provided Medicaid services, the County kept the "net" amount of

17 the funds (gross payment minus the amount of the IGT) in the

18 County's Hospital Enterprise Funds.  The County returned to its

19 general fund an amount equal to the IGT sent to the State to

20 finance the payment. See Gary Wells Dep. at 79:14-80:21 ("Wells

21 Dep."), Ex. 13 of Yip Decl.; Naimo Decl. ¶¶ 9, 11.[6]   The County

22 _____

23     [5] Plaintiff disputes this fact. Def.'s RSUF 9. However, none
    of the cited to excerpts of Chell's deposition contradict what
24  defendant has stated, namely, that the County disclosed the above
    information to the State.  The court therefore finds this fact
25  undisputed.

26     [6] Plaintiff also states that this fact is disputed, yet fails
    to cite to any evidence which supports her position.

did not track SB 1255 dollars once they were deposited in its Hospital Enterprise Funds or the County general fund.  Wells Dep. at 80:22-81:19, Ex. 13 of Yip Decl.

**E.   Negotiations with CMS**

The State sought reimbursement from the Federal government for a share of its Medicaid expenditures.  Wells Dep. at 223:8-13, Ex. 13 of Yip Decl.  These claims were made quarterly on Form CMS-64.  The State used the CMS-64 form to inform the Federal government of the total, statewide amount of federal reimbursement it was claiming for all Medicaid expenditures by the State, including SB 1255 disbursements the State had made to providers.  Stan Rosenstein Dep. at 59:16-60:22, ("Rosenstein Dep.") Yip. Decl. Ex. 4.  The forms were prepared by the State Department of Health Services Accounting Division.  Id.

**F.   Plaintiff's Second Amended Complaint**

The parties have different understandings of what plaintiff's complaint actually alleges.  The confusion over plaintiff's complaint is not new.  In the court's August 30, 2005 Order denying defendant's motion to dismiss, the court noted that "because of the complexity of the Medicare system, relator's pleadings leave much to be desired in terms of clarity."  August 30, 2005 Order at 15.  The court therefore takes this opportunity to more precisely define plaintiff's complaint.

Plaintiff voluntarily dismissed her third, fourth, and seventh claims for relief.  Plaintiff has four remaining claims, all brought under the False Claims Act:  31 U.S.C. § 3729(a)(1)

8

(knowingly presenting, or causing to be presented, to the United States Government a false or fraudulent claim for payment or approval); § 3729(a)(2) (knowingly making, using, or causing to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government); § 3729(a)(7) (knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government); and § 3729(a)(3) (conspiring to defraud the Government by getting a false or fraudulent claim allowed or paid).

A plain reading of the complaint reveals that the thrust of plaintiff's allegation is that the County violated the FCA when it caused and/or conspired with the State to seek federal funds under Medicaid, funds which the County was not entitled to receive. According to plaintiff, the County was not entitled to receive these funds because the County failed to demonstrate a "purpose" under the SPCP. As the court explained in its last order:

> From what the court can determine, the false claim that defendant allegedly made to the State, which was consequently made to the Federal government, is that the funds which were disbursed to it by the State under SB 1255 would be used to provide health care and related remedial or preventative services when, in actuality, the funds disbursed to it were "expended for non-Medicaid, and even non-healthcare purposes." Although not entirely clear from their complaint, the court clarified with counsel for relator during oral argument, that relator avers that defendant misused both the funds transferred to the State by the County (what defendant refers to as "IGT" funds), and the federal matching funds.

1    August 30, 2005 Order at 17.

2  **G.   Prior Motion Practice**

3    On August 30, 2005, the court denied the County's motion to

4  dismiss. The County's motion was premised on the grounds that

5  plaintiff's claims were barred under the FCA public disclosure

6  requirement.   The FCA bars a qui tam action that is based on

7  allegations or transactions already disclosed in certain public

8  fora, unless the relator is the original source of the

9  information underlying the action.  See A-1 Ambulance Serv., Inc.

10 v. California, 202 F.3d 1238, 1243 (9th Cir. 2000).   In its

11 August 2005 Order the court found that there were no public

12 disclosures which contained references to the "allegations or

13 transactions" giving rise to plaintiff's claim.

14                              **III.**

15                **STANDARD FOR SUMMARY JUDGMENT**

16    Summary judgment is appropriate when it is demonstrated that

17 there exists no genuine issue as to any material fact, and that

18 the moving party is entitled to judgment as a matter of law.

19 Fed. R. Civ. P. 56(c); See also Adickes v. S.H. Kress & Co., 398

20 U.S. 144, 157 (1970); Secor Limited v. Cetus Corp., 51 F.3d 848,

21 853 (9th Cir. 1995).

22    Under summary judgment practice, the moving party

23         [A]lways bears the initial responsibility of
           informing the district court of the basis
24         for its motion, and identifying those
           portions of "the pleadings, depositions,
25         answers to interrogatories, and admissions
           on file, together with the affidavits, if
26         any," which it believes demonstrate the

                               10

1    absence of a genuine issue of material fact.

2 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the

3 nonmoving party will bear the burden of proof at trial on a

4 dispositive issue, a summary judgment motion may properly be made

5 in reliance solely on the 'pleadings, depositions, answers to

6 interrogatories, and admissions on file.'" Id. Indeed, summary

7 judgment should be entered, after adequate time for discovery and

8 upon motion, against a party who fails to make a showing

9 sufficient to establish the existence of an element essential to

10 that party's case, and on which that party will bear the burden

11 of proof at trial. See id. at 322. "[A] complete failure of

12 proof concerning an essential element of the nonmoving party's

13 case necessarily renders all other facts immaterial." Id. In

14 such a circumstance, summary judgment should be granted, "so long

15 as whatever is before the district court demonstrates that the

16 standard for entry of summary judgment, as set forth in Rule

17 56(c), is satisfied." Id. at 323.

18    If the moving party meets its initial responsibility, the

19 burden then shifts to the opposing party to establish that a

20 genuine issue as to any material fact actually does exist.

21 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

22 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv.

23 Co., 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

24    In attempting to establish the existence of this factual

25 dispute, the opposing party may not rely upon the denials of its

26 pleadings, but is required to tender evidence of specific facts

11

in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Anderson, 477 U.S. 248-49; see also Cline v. Industrial Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's

1  note on 1963 amendments); see also International Union of

2  Bricklayers & Allied Craftsman Local Union No. 20 v. Martin

3  Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

4       In resolving the summary judgment motion, the court examines

5  the pleadings, depositions, answers to interrogatories, and

6  admissions on file, together with the affidavits, if any. Rule

7  56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093

8  (9th Cir. 1999). The evidence of the opposing party is to be

9  believed, see Anderson, 477 U.S. at 255, and all reasonable

10 inferences that may be drawn from the facts placed before the

11 court must be drawn in favor of the opposing party, see

12 Matsushita, 475 U.S. at 587 (citing United States v. Diebold,

13 Inc., 369 U.S. 654, 655 (1962) (per curiam)); See also Headwaters

14 Forest Defense v. County of Humboldt, 211 F.3d 1121, 1132 (9th

15 Cir. 2000). Nevertheless, inferences are not drawn out of the

16 air, and it is the opposing party's obligation to produce a

17 factual predicate from which the inference may be drawn. See

18 Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45

19 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

20      Finally, to demonstrate a genuine issue, the opposing party

21 "must do more than simply show that there is some metaphysical

22 doubt as to the material facts. . . . Where the record taken as

23 a whole could not lead a rational trier of fact to find for the

24 nonmoving party, there is no 'genuine issue for trial.'"

25 Matsushita, 475 U.S. at 587 (citation omitted).

26                                **IV.**

                                  13

**ANALYSIS**

Plaintiff brings two motions for partial summary judgment. The first motion argues that the County could not demonstrate "purpose" under the SPCP for additional funds. The second motion seeks adjudication that, as a matter of law, the State of California discriminated in favor of the County's hospitals in connection with the distribution of SB 1255 funds in violation of 42 C.F.R. Sec. 431.55(f).

Defendant also brings two motions.[7] Defendant's motion to dismiss for lack of subject matter jurisdiction is premised on the jurisdictional bar set forth in the FCA. Defendant's motion for summary judgment seeks adjudication of plaintiff's entire complaint on the grounds that plaintiff cannot prove the essential elements of a claim pursuant to the FCA.

For the reasons discussed herein, the court finds that plaintiff failed to furnish sufficient evidence to establish any genuine material issue of fact so that a reasonable trier of fact could find in its favor that defendant knowingly submitted a false claim. Accordingly, the court grants summary judgment in defendant's favor.

**A.   The False Claims Act**

The False Claims Act (FCA) imposes liability on those who defraud the government. 31 U.S.C. § 3729. It encourages the

---

[7] Defendant also filed a motion to strike certain evidence submitted by plaintiff in support of plaintiff's motion for partial summary judgment.

14

uncovering of such fraud by permitting private persons to bring qui tam actions on behalf of the government. Id. at § 3730(b); see also United States ex rel. Campbell v. Redding Med. Ctr., 421 F.3d 817, 823 (9th Cir. 2005) ("'[T]he Committee's overall intent in amending the qui tam section of the False Claims Act is to encourage more private enforcement suits.'" (quoting Sen. Rep. No. 99-345, at 23-24 (1986))). Such qui tam relators then share in any recovery obtained on the government's behalf. 31 U.S.C. § 3730(d).

Liability under the False Claims Act occurs when a person,

> (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ...a false or fraudulent claim for payment or approval;
>
> (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; [or]
>
> ...
>
> (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a).

Although plaintiff brought suit under each of these subdivisions, the analysis as to what constitutes "knowingly" and intent is essentially the same for all four.

In order to establish liability under the FCA, plaintiff must prove three elements: (1) a "false or fraudulent" claim; (2)

1  which was presented, or caused to be presented, by the Defendant

2  to the United States for payment or approval; (3) with knowledge

3  that the claim was false.  See United States v. Mackby, 261 F.3d

4  821, 826 (9th Cir. 2001); 31 U.S.C. § 3729(a).

5      The Act expansively defines the term "claim" to cover "any

6  request or demand, whether under a contract or otherwise, for

7  money or property ... if the United States Government provides

8  any portion of the money or property which is requested or

9  demanded."   31 U.S.C. § 3729(c).   See also Costner v. URS

10  Consultants, Inc., 153 F.3d 667, 677 (8th Cir. 1998) ("[O]nly

11  those actions by the claimant...[calculated to] caus[e] the

12  United States to pay out money it is not obligated to pay ... are

13  properly considered 'claims' within the meaning of the FCA.");

14      As explained by the Second Circuit, the term "false or

15  fraudulent" is not defined in the FCA.  See Mikes v. Straus,  274

16  F.3d 687, 696 (2d Cir. 2001).  A common definition of "fraud" is

17  "an intentional misrepresentation, concealment, or nondisclosure

18  for the purpose of inducing another in reliance upon it to part

19  with some valuable thing belonging to him or to surrender a legal

20  right." Webster's Third New International Dictionary 904 (1981).

21  "False" can mean "not true," "deceitful," or "tending to

22  mislead."  Id.  The juxtaposition of the word "false" with the

23  word "fraudulent," plus the meanings of the words comprising the

24  phrase "false claim," suggest an improper claim is aimed at

25  extracting money the government otherwise would not have paid.

26  Id.  Mikes 274 F.3d at 696.

1   Claims are not "false" under the FCA when reasonable persons

2   can disagree regarding whether the service was properly billed

3   to the Government. See United States ex rel. Lamers v. City of

4   Green Bay, 168 F.3d 1013, 1018 (7th Cir. 1999) (holding that

5   "errors based simply on faulty calculations or flawed reasoning

6   are not false under the FCA ... [a]nd imprecise statements or

7   differences in interpretation growing out of a disputed legal

8   question are similarly not false under the FCA") (citations

9   omitted); Hagood v. Sonoma County Water Agency, 81 F.3d 1465,

10  1477 (9th Cir. 1996) ("How precise and how current the cost

11  allocation needed to be in light of the [Water Supply Act's]

12  imprecise and discretionary language was a disputed question

13  within the [Government]. Even viewing [plaintiff's] evidence in

14  the most favorable light, that evidence shows only a disputed

15  legal issue; that is not enough to support a reasonable inference

16  that the allocation was false within the meaning of the False

17  Claims Act").

18      The requisite intent is the knowing presentation of what is

19  known to be false. "In short, the claim must be a lie." Hindo

20  v. Univ. of Health Sciences/The Chicago Med. Sch., 65 F.3d 608,

21  613 (7th Cir. 1995). The Act defines "knowingly" as: (1)

22  possessing actual knowledge; (2) acting in deliberate ignorance

23  of falsity; or (3) acting in reckless disregard of falsity. See

24  § 3729(b).

25      For the purposes of the case at bar, it is important to note

26  that the Federal government's knowledge of the alleged false

17

1   claim is relevant to whether the defendant "knowingly" submitted

2   a false claim.   This is known as the "government knowledge

3   defense" to FCA liability.   As explained more fully below, this

4   defense suggests that the "knowing" submission of fraudulent

5   claims is logically impossible when responsible government

6   officials have been fully apprised of all relevant information.

7   See United States ex rel. Lamers v. City of Green Bay, 998 F.

8   Supp. 971, 988 (E.D. Wis. 1998).   Since the crux of an FCA

9   violation is intentionally deceiving the government, no violation

10  exists where relevant government officials are informed of the

11  alleged falsity, thus precluding a determination that the

12  government has been deceived. Id., see also United States ex rel.

13  Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 327 (9th Cir.

14  1995); Wang ex rel. United States v. FMC Corp., 975 F.2d 1412,

15  1421 (9th Cir. 1992).

16  **B.   Defendant's Motion for Summary Judgment**

17      Defendant moves for summary judgment on the four remaining

18  claims set forth in plaintiff's complaint.   In this section, the

19  court reviews the key facts, and then examines the various

20  elements necessary for establishing liability under the FCA.

21      **1.   Overview of the SB 1255 Funding Scheme**

22      Given the complicated nature of this case, the court

23  revisits the facts at issue in the pending motions.   Rather than

24  get bogged down in detail, the court attempts to set forth an

25  overall understanding of the undisputed facts.

26      Under SB 1255, (a state statute) certain providers of

18

Medicaid services can seek supplemental Medicaid funding.  The County is one such provider.  Under SB 1255, IGTs from public entities (such as the County) are used for the non-federal share of the supplemental funds.  In other words, at the time at issue in this case, the County would transfer money to the State, which in turn, would use that money to apply for matching funds from the Federal government.  Providers such as the County could seek up to 175% of uncompensated costs under SB 1255.  The idea was that the State would "put up" part of the funds and then the Federal government would "match" the State's contribution.

Once the State made the SB 1255 payment to the County (which consisted of both the State and Federal shares), the "net" amount would go to the hospitals (the gross payment minus the IGT amount) and the amount of the initial IGT would go to the County's general DHS fund.

It is also clear that once the County received the SB 1255 payment it was not limited to how it used the money.  As Bruce Vladeck, the Administrator of Health Care Financing Administration[8] from 1993-1997, testified:

> Q:  What did you mean earlier when you said that from the Federal government's point of view, money is fungible and all you are really looking at is whether the State's payments are for services actually provided?
>
> A:  Well, again, in this context, in the case of Los Angeles County Department of Health Services, they receive a check from the State of California for an SB 1255 payment.  The sources of those dollars are an

---

[8] "Health Care Financing Administration" was the former name of the Center for Medicare & Medicaid Services ("CMS").

intergovernmental transfer and a federal match. Is it relevant from the Federal government's point of view whether the intergovernmental transfer, whether any part of those dollars, frankly, are actually spent to pay nurses or to buy aspirin or to pay for the electricity in the facility?  The answer is because money is fungible, the answer is no.

****

[T]here is a separate underlying philosophical issue, which is ever since the 1980s - and, again, 1255 is a very good reflection of it - it has been the policy of the Federal government and its health insurance programs to move away from a philosophy of cost reimbursement to a philosophy of setting appropriate prices and then letting the provider use the funds received . . . however they think best, provided they are providing the services for which they are billing.

Vladeck Dep. at 52:17-54:19, Ex. 2 of Yip Decl.; see also Vladeck

Dep. at 37:21-38:9 ("[M]oney is fungible.  Once it was paid to

the hospitals, if it was paid for services that were actually

being provided, at that point our sort of formal jurisdiction

over it and interest of what became of the funds ended.").

In order to be eligible to receive SB 1255 funds, providers

had to (1) serve a disproportionate share of low income patients,

(2) operate an emergency room, and (3)  "demonstrate a purpose

for additional funding under the [SPCP] including proposals

relating to emergency services and other health care services ...

that are made available, or will be made available, to Medi-Cal

beneficiaries,"  Cal. Welf. & Inst. Code § 14085.6(g).

The parties greatly dispute the meaning of the word

"purpose" in Cal. Welf. & Inst. Code § 14085.6(g).  Plaintiff

argues in both her opposition and motion for summary judgment

that this provision of the California Code is a requirement to

20

receiving funding.  <u>See</u> Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 14; <u>see</u> <u>generally</u> Pl.'s Mot. for Summ. Adjudication.   The County, however, maintains that showing "purpose" can be met by seeking funds to preserve the availability of Medicaid services. As explained below, this dispute is immaterial in resolving the pending motions.   Even if the court accepts plaintiff's interpretation of the Code, there is simply no evidence of the County's intent to file a false or fraudulent claim.

With this basic understanding of the facts in mind, the court turns to the substance of defendant's motion.

**2.  Elements of FCA claim**

As noted earlier, the FCA prohibits any person from knowingly presenting a false or fraudulent claim for payment or approval by the Federal government.   31 U.S.C. § 3729(a)(1). Therefore, establishing liability under the FCA requires proof that: (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) that the defendant knew the claim was false or fraudulent.   <u>See</u> <u>United States ex rel. Oliver v. Parsons Co.</u>, 195 F.3d 457, 461 (9th Cir. 1999). The court addresses the key elements.

**i.  Falsity of Claim**

The court first addresses the issue of whether defendant made a "false" claim to the Federal government.   In order to establish "falsity" there must be evidence the claim was aimed at extracting money the government otherwise would not have paid. <u>See</u> <u>Mikes v. Straus</u>, 274 F.3d 687, 696 (2nd Cir. 2001). <u>See</u> <u>also</u>

1   Clarence T. Kipps, Jr. et al., <u>Materiality as an Element of</u>

2   <u>Liability Under the False Claims Act</u>, A.B.A. Center for

3   Continuing Legal Educ. Nat'l Inst. (1998), B-37, B-46 ("[A] claim

4   cannot be determined to be true or false without consideration

5   of whether the decisionmaker should pay the claim - that is, a

6   claim is 'false' only if the Government or other customer would

7   not pay the claim if the facts about the misconduct alleged to

8   have occurred were known.").

9       Plaintiff's complaint alleges that the County either caused

10  and/or conspired with the State to falsely claim Medicaid funds

11  which the County was not entitled to receive. Namely, the County

12  caused the State to submit a false claim for SB 1255 funding

13  because the County could not meet the requirement of

14  demonstrating a "purpose" for additional funding under SP 1255.

15  <u>See</u> Pl.'s Opp'n to Def.'s Mot. for Summ. J. at 13-20.

16      Both parties expend a great deal of time and energy

17  discussing the meaning of the word "purpose" and whether it is

18  a requirement or merely an eligibility criteria to receive SB

19  1255 funds. In brief, defendant argues that plaintiff cannot

20  establish falsity because SB 1255 payments were not limited to

21  costs. Rather, both the plain reading of the statute, as well

22  as the legislative history, suggest that the language referring

23  ////

24  ////

25

26

to "purpose" is an eligibility condition.[9]   "By the plain language of SB 1255, the payments are to help disproportionate share hospitals preserve access to Medicaid services, not simply cover costs."  Def.'s Mot. for Summ. J. at 19.  Defendant also argues that no law restricts how the County spend the SB 1255 funds.

Plaintiff avers that the "purpose" language should be construed as a restriction on how the County could use the SB 1255 funds.  Because the County did not use all SB 1255 funds for medical services, plaintiff contends that the County could not demonstrate a purpose for supplemental funding under SP 1255 and thus, did not qualify for supplemental funding.  See generally, Pl.'s Opp'n at 19.

Both parties appear to be asking the court to interpret Cal. Welf. & Inst. Code § 14085.6(g) and the meaning of "purpose." There are several reasons the court need not engage in statutory interpretation at this point in time.

First, whether the County caused and/or conspired to submit a "false" claim turns on how a state code provision, namely Cal. Welf. & Inst. Code § 14085.6(g), is interpreted.  Plaintiff and defendant have divergent views as to the meaning and significance of the word "purpose."  This question of interpretation is purely a legal dispute.

---

[9] Pursuant to Federal Rule of Evidence 201, the court takes judicial notice of the documents attached as Exhibits 3 through 5 to the Declaration of Martha Boersch.  The documents reflect the legislative history of SB 1255.

It is well established in this Circuit and elsewhere that imprecise statements or differences in interpretation growing out of a disputed legal question are not false under the FCA. <u>Hagood</u>, 81 F.3d at 1477-78 ("Even viewing [plaintiff's] evidence in the most favorable light, that evidence shows only a disputed legal issue; that is not enough to support a reasonable inference that the allocation was false within the meaning of the False Claims Act.").

Indeed, claims are not "false" under the FCA when reasonable persons can disagree regarding whether the service was properly billed to the government. <u>See</u> <u>Lamers</u>, 168 F.3d at 1018("errors based simply on faulty calculations or flawed reasoning are not false under the FCA, [a]nd imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA") (citations omitted). <u>See also</u> <u>United States v. Prabhu</u>, 442 F. Supp. 2d 1008, 1033 (D. Nev. 2006) ("To establish falsity under the FCA, it is not sufficient to demonstrate that the person's practices could have or should have been better. Instead, plaintiff must demonstrate that an objective gap exists between what the Defendant represented and what the Defendant would have stated had the Defendant told the truth."); <u>United States ex rel. Roby v. Boeing Co.</u>, 100 F. Supp. 2d 619, 625 (S.D. Ohio 2000) ("At a minimum, the FCA requires proof of an objective falsehood .... Expressions of opinion, scientific judgments, or statements as to conclusions about which reasonable minds may differ cannot be false").

1    Whether Cal. Welf. & Inst. Code § 14085.6(g) imposes
2  criteria or requirements, is a legal question upon which
3  reasonable minds could differ.  As discussed in more depth below,
4  the County presents evidence which suggests that its
5  interpretation of § 14085.6(g) and the meaning of "purpose" was
6  in fact reasonable and widely recognized and understood.

7    There is a second reason the court need not interpret the
8  meaning of "purpose."  It is well established that the FCA is not
9  a vehicle for ensuring regulatory compliance.  See, e.g., United
10 States ex rel. Hopper v. Anton, 91 F.3d 1261, 1267 (9th Cir.
11 1996) ("[v]iolations of laws, rules, or regulations alone do not
12 create a cause of action under the FCA").  Thus, even if the
13 County did not fully comply with the California code, this
14 alleged non-compliance does not, without more, establish a
15 "false" claim.  Lamers, 168 F.3d at 1020  ("the FCA is not an
16 appropriate vehicle for policing technical compliance with
17 administrative regulations").  As a sister court remarked, the
18 "False Claims Act only attaches liability to false claims for
19 payment, not to underlying activity that allegedly violates
20 federal law." United States ex rel. Swan v. Covenant Care, Inc.,
21 279 F. Supp. 2d 1212, 1221 (E.D. Cal. 2002) (J. Levi).  Although
22 the circumstances of the cases are not analogous, the Swan court
23 offers helpful guidance on the question of statutory compliance:

24

25         To allow FCA suits to proceed where government payment
           of Medicare claims is not conditioned on perfect
26         regulatory compliance - and where HHS [Department of

25

> Health and Human Services] may choose to waive administrative remedies, or impose a less drastic sanction than full denial of payment - would improperly permit qui tam plaintiffs to supplant the regulatory discretion granted to HHS under the Social Security Act, essentially turning a discretionary denial of payment remedy into a mandatory penalty for failure to meet Medicare requirements.

Id. at 1222.  In the case at bar, even if the County did not sufficiently comply with Cal. Welf. & Inst. Code § 14085.6(g), liability under the FCA is not necessarily triggered.  Indeed, the cited cases suggest that the FCA is not the vehicle with which to police statutory compliance.

There is a third reason why the court need not engage in statutory interpretation of § 14085.6(g).  Even if the court were to accept plaintiff's interpretation of § 14085.6(g), no reasonable jury could conclude that the County had the requisite scienter to establish liability.  In other words, even if the County caused the State to make "false" claims, the record lacks any evidence that the County knowingly made a false claim, one of the key elements for establishing liability under the FCA.

**ii.  Knowing Submission of False Claim**

For the reasons discussed herein, the court concludes that there is a want of evidence from which a jury could reasonably infer that the County knowingly asserted a false claim to the government.

The FCA's scienter requirement is laid out in section 3729(b) of the FCA.  One violates the Act if one has "actual knowledge" that one is submitting a false or fraudulent claim for

1    payment or approval, "acts in deliberate ignorance of the truth

2    or falsity" of one's false claim, or "acts in reckless disregard

3    of the truth or falsity" of one's false claim.   31 U.S.C. §

4    3729(b).  As held in Hagood:

5          Innocent mistake is a defense to the criminal charge or
           civil complaint. So is mere negligence. The statutory
6          definition of 'knowingly' requires at least 'deliberate
           ignorance' or 'reckless disregard' ... [W]hat constitutes
7          the offense is not intent to deceive but knowing
           presentation of a claim that is either 'fraudulent' or
8          simply 'false'. The requisite intent is the knowing
           presentation of what is known to be false.
9

10   Hagood, 929 F.2d at 1421.  The requisite intent is the knowing

11   presentation of what is known to be false.

12         Indeed, "for a qui tam action to survive summary judgment,

13   the relator must produce sufficient evidence to support an

14   inference of knowing [falsity]." United States ex rel. Anderson

15   v. Northern Telecom, Inc., 52 F.3d 810, 815 (9th Cir. 1995),

16   cert. denied, 516 U.S. 1043(1996).

17         In the case at bar, it is undisputed that the Federal

18   government knew what the County was doing and implicitly approved

19   of the County's actions.   Given the fact that the County's

20   alleged "scheme" was well known and public, it cannot also be

21   true that the County had the requisite intent to purposefully

22   defraud the government.

23         **iii.   The Government Knowledge Defense**

24         It is well settled that the Federal government's knowledge

25   of an alleged "false" claim contradicts a defendant's intent to

26   knowingly submitted a false claim.   See Butler, 71 F.3d at 327;

                                    27

1   <u>Wang</u>, 975 F.2d at 1421.   This is known as the "government

2   knowledge defense."   In essence, this defense holds that the

3   "knowing" submission of a false claim is logically impossible

4   when responsible government officials have been fully apprised

5   of all relevant information. <u>Lamers</u>, 998 F. Supp. at 988. Since

6   the crux of an FCA violation is intentionally deceiving the

7   government, no violation exists where the government has not been

8   deceived.   <u>Id.</u>

9        Two Ninth Circuit cases illustrate this type of defense.

10  In <u>United States ex rel. Butler v. Hughes Helicopters, Inc.</u>, 71

11  F.3d 321, 327 (9th Cir. 1995), the United States Army and the

12  defendant, a manufacturer of military helicopters, maintained a

13  pattern of close communication over the course of a complicated,

14  highly technical procurement process.   Although the plaintiff

15  produced evidence that certain testing requirements were not met

16  despite official statements to the contrary, the court held that

17  because the Army was fully aware of and acceded to all deviations

18  from the testing regime, the defendant had not acted with the

19  requisite intent to deceive.   <u>Id.</u> at 326-29.

20       Similarly, in <u>Wang v. FMC Corp.</u>, 975 F.2d 1412, 1421 (9th

21  Cir. 1992), another case involving a defense contractor, the

22  court concluded that "[t]he fact that the government knew of

23  [defendant's] mistakes and limitations, and that [defendant] was

24  open with the government about them, suggests that while

25  [defendant] might have been groping for solutions, it was not

26

1  cheating the government in the effort." Id. at 1421.[10]

2  In the case at bar, the County submits extensive evidence

3  that officials on both the State and Federal levels were well

4  aware of the County's actions and understood the alleged "scheme"

5  to be legal. Thus, even if the County caused the State to

6  submit a "false" claim, the government's knowledge negates the

7  County's intent. See Butler, 71 F.3d at 327.

8  **iv. Evidence of Government Knowledge**

9  The County presents evidence that CMS was fully aware that

10  the County was using a legal loophole to maximize the amount of

11  federal funding the State could receive for Medicaid services.

12  As the County explained in its brief, "CMS did not like the IGT

13  programs, to be sure, but they were legal, enjoyed statuary

14  protection, and helps to preserve the viability of public safety-

15  net hospitals in the absence of national health insurance."

16  Def.'s Reply at 32.

17  _____

18  [10] Other circuits also recognize the government knowledge defense. See, e.g., United States ex rel. Becker v. Westinghouse

19  Savannah River Co., 305 F.3d 284, 288 (4th Cir. 2002)(where the government knows and approves of the particulars of a claim for

20  payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim- the government's knowledge effectively negates the fraud or falsity

21  required by the FCA); United States ex rel. Durcholz v. FKW, Inc.,

22  189 F.3d 542, 545 (7th Cir. 1999) ("If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly

23  presented a fraudulent or false claim."); United States v.

24  Southland Mgmt. Corp., 288 F.3d 665, 686 (5th Cir. 2002) (rejecting government knowledge defense but noting that such a defense would

25  be viable "where the falsity of the claim is unclear and the evidence suggests that the defendant actually believed his claim

26  was not false because the government approved and paid the claim with full knowledge of the relevant facts.").

29

1    First, using IGTs to maximize federal contributions is a
2 phenomenon that is not unique to the County, or even to
3 California.  As the County explained in its motion, since the
4 early 1990's, CMS has tried a number of approaches to prevent
5 states from using Medicaid maximization "schemes" to increase the
6 amount of federal reimbursement without a corresponding increase
7 in Medicaid services.  Acknowledging the legality of these
8 "schemes," CMS has changed upper payment limit regulations and
9 has negotiated with states to stop using IGTs.  See Medicaid
10 Program, State Share of Financial Participation, 56 Fed. Reg.
11 56132, 56132 (1991); Statement of Regulatory Priorities, 65 Fed.
12 Reg. 73354, 73375 (2000); Revision to Medicaid Upper Payment
13 Limit Requirements for Hospital Services, Nursing Facility
14 Services, Intermediate Care Facility Services for the Mentally
15 Retarded, and Clinic Services, 66 Fed. Reg. 3148, 3164-65, 3168
16 (2001).[11]

17    Second, CMS understood and knew of the County and State's
18 practice of using IGTs to obtain additional federal funding.
19 Thomas Scully, the Administrator of CMS, testified that he was
20 well aware that Los Angeles County was taking back the amount of
21 the IGTs and transferring it to its general fund.  As Scully
22 testified, "almost every state was doing that to some degree."

23

24    [11]  It is important to note that while Congress imposed
restrictions on states' use of IGTs, California was granted relief
25 from these payment limits – at least for the time periods relevant
to this litigation.  See Balanced Budget Act of 1997, Pub. L.
26 105-33, Title IV, § 4721(e), 111 Stat. 251, 514.

Scully Dep. at 98:14-20, Ex. 16 of Yip. Decl.  Scully goes on to

explain:

> The money is fungible.  The fundamental problem is there is
> no way to track the dollars.  So the fundamental problem
> is, whether it is ... upper payment limits or
> intergovernmental transfers, it is all a way of just
> getting air to claim and draw down your federal match ...
> I was very aware of what they were doing all along.

Scully Dep. at 99:8-18.  Scully went on to confirm that he was

well aware of the fact that some of the SB 1255 money was going

into the general fund.  Id.  While expressing concern with this

scheme, Scully made it very clear that he knew of the scheme and

believed it was legal.  As Scully explained, "everybody in

Congress understood it was a total scam, but it happened to be

a scam Congress authorized."  Scully Dep. at 110:11-13.

State level officials were also aware of how the County was

using IGTs and that the amount of the IGT from the County to the

State was not available to finance the County's Department of

Health Services.  For example, there is ample testimony that

County representatives informed State representatives that only

the net SB 1255 benefit (that is, the gross payment minus the IGT

amount) was available to finance the needs of the providers.  See

Freedman Decl, ¶¶ 14-17; Rodriguez Decl. ¶¶ 5-12.  There is also

testimony that State officials were well aware of the County's

use of IGTs.  For example, Stan Rosenstein, the statistician for

the California Department of Health Services testified that he

knew that the County took part of the SB 1255 payment to put in

the County's general fund.  Rosenstein testified that he knew

1  this from "numerous presentations by the LA County, both to us

2  [CA DHS], to the commission [CMAC], to the Federal government

3  over many years of them presenting that false information."

4  Rosenstein Dep, at 37:3-6., Ex. 4 of Yip Decl.

5       The Executive Director of CMAC, Bryon Chell, also testified

6  that he knew about Los Angeles County's practice of using IGTs

7  to help the State pull down federal funds.  In fact, Chell was

8  well aware that the County was trying to get as much money as

9  they could without going above the 175% limit.  "My understanding

10 was that they were always trying to seek their maximum amount of

11 money, including federal funds, to save their healthcare system."

12 Chell Dep. at 84:24-85:2., Ex. 6 of Yip Decl.

13      Congressional hearings also confirmed that the scheme

14 practiced by the County was not unique.  In 2000, CMS Medicaid

15 Director Tim Westmoreland testified before Congress that even

16 abusive IGT practices were legal:

17          SEN. BREAUX:  The disturbing thing that I have here is
            that we're emphasizing the States doing these schemes
18          and legal money laundering and yet we in Washington,
            probably with the help of a number of members of
19          Congress who have written and called and supported
            this effort, and now had it sort of made to look like
20          the states are doing something that was highly
            inappropriate and improper, but yet every state that's
21          doing it has been approved by the Federal government
            that runs the program.

22
            MR. WESTMORELAND:   Mr. Breaux, I do not mean to
23          suggest that states are doing anything illegal in any
            way.   These have been approved and I do recognize
24          that.

25          SEN. BREAUX:  Well, Ms. Allen and Mr. Mangano talked
            in terms of legalized money laundering and financial
26          schemes.  It doesn't sound too complimentary to what

1    they're doing.  If I was from the State, I'd say look
     I've got this piece of paper from Washington that says
2    I can do exactly what I'm doing and now you're calling
     it all kind of dastardly names.
3
     MR. WESTMORELAND:  With all difference [sic] I think
4    the important word in that phrase is legalized money
     laundering.  I do consider this to be inappropriate,
5    but it is not illegal.

6    SEN. BREAUX:  Well how can it be inappropriate if your
     office has stamped its approval on it?
7
     MR. WESTMORELAND:   I'm afraid that in retrospect I
8    think people would have been better advised to propose
     a more limited regulation that did to other publicly
9    owned facilities what we did in 1987 for state-owned
     facilities.  I think it would have better advised.
10

11   Yip Decl., Ex. 28 at DEF 36497.

12        Finally, it was also understood by the Federal government

13   that the County could spend the SB 1255 payments however it

14   liked.  See Scully Dep. at 85:1-9 ("...we let the State use their

15   savings and the federal savings for other purposes.") & 113:9-24.

16        In sum, the County has met its initial burden of setting

17   forth facts which demonstrate the absence of a genuine issue of

18   material fact. The burden shifts to plaintiff to establish that

19   disputed facts remain.  Matsushita, 475 U.S. at 586.

20        Plaintiff fails to cite to any evidence which suggests that

21   the State or Federal government did not know of the County's

22   practices.  Plaintiff's strongest argument is that "there is no

23   evidence that the Government had knowledge of the County's

24   inability to demonstrate a 'purpose' for SB 1255 funding."  Pl.'s

25   Opp'n to Def.'s Mot. for Summ. J., at 35, citing Haydel Decl.,

26   Exs. MM, GG at 83:1-22, 83:24-84:15, 140:16-1.).  Even if this

were true, however, plaintiff cites no evidence which disputes the pages of deposition testimony in which high level government officials acknowledge that they knew of the County's scheme to get the maximum amount of federal dollars possible.[12]   Indeed, the central allegation of plaintiff's complaint is not that defendant was violating Cal. Welf. & Inst. Code § 14085.6(g) by not demonstrating a "purpose", but that defendant was causing or conspiring to cause the State to make false claims to the Federal government.   Therefore, whether the County could demonstrate a "purpose" under the California Code is not dispositive as to whether the County knowingly submitted a false claim from the government.

In short, the County has presented sufficient facts that officials at all levels of government knew of the County's practices, thereby negating intention under the "government knowledge defense."   Here, as in Butler, the Federal government was fully aware of the County's practices and thus the County did not act with the requisite intent to deceive.   Butler, 71 F.3d at 326-29.

Indeed, while the County's practices were not necessarily

---

[12]   If additional evidence exists, the court cannot locate it in the massive record which was submitted in this case.  All told, over three hundred pages of briefs were submitted and at a minimum, over one thousand pages of exhibits.   The court reminds both parties that "'[j]udges are not like pigs, hunting for truffles buried in' the record." Albrechtsen v. Board of Regents of University of Wisconsin System, 309 F.3d 433, 436 (7th Cir. 2002)(quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991).

popular with Congress and CMS, there was a common understanding that the practices were legal.  For this reason, the court finds that there is a want of evidence from which a jury could infer that the County knowingly asserted a false claim to the Federal government and summary judgment must be entered for the County.[13]

The court's ruling on the County's motion for summary judgment is dispositive as to the entirety of plaintiff's complaint.  The remaining motions are therefore moot and the court need not address them.[14]

---

[13]   Given that the County did not have the requisite scienter to establish liability under FCA, the court need not address the third element of FCA liability, namely, whether the County's actions constituted a "claim" under the FCA.

[14]   To be clear, the partial motions for summary judgment filed by plaintiff were not cross motions to defendant's motion for summary judgment.   Plaintiff's first motion is entitled: "Plaintiff's Motion for Summary Adjudication Regarding the County's Inability to Demonstrate A Purpose under the SPCP for Additional Funds." The second motion is entitled, "Plaintiff's Motion for Summary Adjudication Regarding the State's Discrimination in Favor of Los Angeles County in Distribution of SB 1255 Funds."

The court cannot help but note that missing from both of plaintiff's motions is any discussion of how these allegations constitute a "false claim" as defined in the FCA and related case law.   There is simply no mention in either motion of what a plaintiff must prove in order to establish liability under the FCA. Although plaintiff spends a great deal of time discussing the scheme by which the County used IGTs to get federal Medicaid funds, there is no explanation as to how this alleged "scheme" constituted a "false claim" under the FCA.

Moreover, even if the Court were to rule in plaintiff's favor and determine that the County had submitted a false claim, for the reasons discussed above, it is clear that the County did not have the requisite scienter to trigger liability under the FCA.

1                              **V.**

2                        **CONCLUSION**

3       For the reasons explained above, the court orders as

4    follows:

5       1.   Defendant's Motion for Summary Judgment is GRANTED.

6       2.   Plaintiff's Motions for Partial Summary Judgment are

7            DENIED.

8       3.   Defendant's Motion to Dismiss is DENIED.

9       4.   Defendant's Motion to Strike is DENIED.

10      IT IS SO ORDERED.

11      DATED: October 31, 2006.

12

13

14                       _____
                         LAWRENCE K. KARLTON
15                       SENIOR JUDGE
                         UNITED STATES DISTRICT COURT

16

17

18

19

20

21

22

23

24

25

26